IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division



| | |
|---|---|
| IN RE: APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 2703(C)(1)(A) AND 3122(A)(1) FOR THE <br>(1) DISCLOSURE OF PROSPECTIVE CELL-SITE DATA AND E-911 PHASE II DATA; <br>(2) DISCLOSURE OF STORED TELECOMMUNICATIONS RECORDS; AND <br>(3) INSTALLATION OF A PEN REGISTER/TRAP AND TRACE DEVICE <br>ON (804) 759-1341 | No. 3:24-SW156 |

**AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**

I, Richard L. Schauer, Jr., being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(c)(1)(A) for information associated with a cellular device ("TARGET CELLULAR DEVICE") assigned telephone number (804) 759-1341 ("SUBJECT TELEPHONE NUMBER"), which is serviced by AT&T ("SERVICE PROVIDER"), bears IMSI 310410388609428, has no listed subscriber information, and is used by William MORTON Jr. AKA "Skillet," who is believed to reside at 1901 Q Street Richmond, Virginia 23223. As a provider of wireless communications service, the SERVICE PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. Because this warrant seeks the prospective collection of information, including cell site location information, that may fall within the statutory definitions of information collected

by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4) ("pen/trap device"), the requested warrant is designed also to comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. The information to be searched is described in the following paragraphs and in Attachment A, incorporated by reference herein. This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the SERVICE PROVIDER to disclose to the government the information further described in Section I of Attachment B, incorporated by reference herein. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B, incorporated by reference herein.

4. I am a Special Agent (SA) of the Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I began my law enforcement career with The Department of Homeland Security, Customs and Border Protection, as a Border Patrol Agent in 2008 where I successfully completed training at the Federal Law Enforcement Training Center in Artisa, New Mexico. As a Border Patrol Agent, I participated in numerous narcotics investigations involving Transnational Drug Trafficking Organizations resulting in both state and federal prosecutions. Since 2016, I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. and the ATF National Academy where I received training in enforcement techniques regarding federal violations involving firearms and narcotics. As a Special Agent, I have conducted and participated in numerous investigations involving both

illegal firearms and narcotics activity. I have made successful applications for federal search and arrest warrants and participated in the execution of those warrants resulting in the successful federal prosecutions for both federal firearm violations and federal narcotics violations.

5. During my employment with ATF, I have conducted and participated in investigations involving Gun Control Act violations. I am familiar with the methods narcotics and firearms traffickers commonly use to conduct their illegal activities, including communication methods, and the use of cellular communication devices.

6. The facts in this Affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and reliable witnesses. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this Affidavit, there is probable cause to believe that criminal violations of 21 U.S.C. § 841, distribution of illegal controlled substances, and 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon, have been committed by William MORTON, Jr. a.k.a. "Skillet". There is also probable cause to search the information described in Attachment A, incorporated by reference herein, for evidence, instrumentalities, contraband, and fruits of these crimes as fully described in Attachment B, incorporated by reference herein.

8. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. The United States, including the Bureau of Alcohol, Tobacco, Firearms & Explosives, is conducting a criminal investigation regarding violations of 21 U.S.C. § 841, distribution of illegal controlled substances, and 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon, have been committed by William MORTON, Jr. a.k.a. "Skillet".

10. Since on or about March 20, 2024, Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Special Agents assigned to Richmond, Virginia Group III have been investigating a drug trafficking organization ("DTO") and individuals also engaged in firearms trafficking operating in and around the greater City of Richmond, Virginia community. Bureau of Alcohol, Tobacco, Firearms & Explosives Special Agents identified William MORTON, Jr. as one of the participants of the DTO in this area. During this investigation, ATF agents have utilized a professional confidential informant ("CI") to make purchases of drugs and firearms from members of this DTO, including MORTON, Jr. Since on or about March 25, 2024, and continuing through the present day, CI has had regular contact with MORTON, Jr. on the SUBJECT TELEPHONE NUMBER.

11. Richmond City Circuit Court records show that on January 15, 2008, William MORTON, Jr. pleaded guilty to Felony Possession of Cocaine with Intent to Distribute, a violation of Virginia Criminal Code § 18.2-248(C) and was sentenced to the Virginia Department of Corrections for a term of 5 years. Richmond City Circuit Court records also show that on November 28, 2018, William MORTON, Jr. pleaded guilty to Felony Possession of Cocaine, a violation of Virginia Criminal Code § 18.2-250A(a) and was sentenced to the Virginia Department of Corrections for a term of 2 years. Richmond City Circuit Court records further show that on May 31, 2019, William MORTON, Jr. pleaded guilty to Felony Distribution of

Heroin-2nd Offense, a violation of Virginia Criminal Code § 18.2-248(C) and was sentenced to the Virginia Department of Corrections for a term of 15 years. Based on these convictions, defendant is prohibited from possessing a firearm pursuant to 18 U.S.C. § 922(g)(1). Furthermore, defendant has an extensive history of involvement with possessing and distributing illegal narcotics.

12. On April 1, 2024, ATF utilized a Confidential Informant ("CI") to contact William MORTON, Jr. at the SUBJECT TELEPHONE NUMBER to arrange the purchase of a firearm that had a machine gun conversion device attached. Later the same day, William MORTON, Jr. possessed and transferred the firearm, a semiautomatic pistol, bearing Serial Number BNYN047, with a suspected machine gun conversion device attached to the CI in exchange for $400.00 in provided Agent Cashier Funds ("ACF").

13. On April 4, 2024, ATF agents utilized the CI to contact William MORTON, Jr. on the SUBJECT TELEPHONE NUMBER to arrange the purchase of illegal narcotics. Later the same day, William MORTON, Jr. sold the CI approximately 2 grams of suspected crack cocaine in exchange for $160.00 in provided ACF. The suspected crack cocaine was sent to the Drug Enforcement Administration ("DEA") Mid-Atlantic Laboratory ("Lab"), where it was determined to be 1.98 grams of cocaine base, a Schedule II controlled substance.

14. On April 8, 2024, ATF agents utilized the CI to contact William MORTON, Jr. on the SUBJECT TELEPHONE NUMBER to arrange the purchase of illegal narcotics. Later the same day, William MORTON, Jr. sold the CI approximately 14 grams of suspected crack cocaine in exchange for $460.00 in provided ACF. The suspected crack cocaine was sent to the DEA Lab, where it was determined to be 13.7 grams of cocaine base, a Schedule II controlled substance.

15. On April 23, 2024, Special Agents utilized a Confidential Informant to contact William MORTON, Jr. on the SUBJECT TELEPHONE NUMBER to arrange the purchase of a firearm and illegal narcotics. Later the same day, William MORTON, Jr. possessed and subsequently transferred to CI a Hi-Point pistol, Model C9, bearing Serial Number P1345735, in exchange for $400.00 in provided ACF. William MORTON, Jr. also sold the CI approximately 9 grams of suspected heroin in exchange for $300.00 in provided ACF. The suspected heroin was submitted to the DEA Lab, where it was determined to be 9.67 grams of fentanyl, a Schedule II controlled substance.

16. In the days leading up to and including on April 26, 2024, ATF agents utilized the CI to contact William MORTON, Jr. on the SUBJECT TELEPHONE NUMBER to arrange the purchase of illegal narcotics. Pursuant to those arrangements, on April 26, 2024, William MORTON, Jr. sold the CI approximately 28 grams of suspected heroin in exchange for $700.00 in provided ACF. The suspected heroin was submitted to the DEA Lab, where it was determined to be 27.85 grams of fentanyl, a Schedule II controlled substance.

17. On May 2, 2024, Special Agents utilized the CI to contact William MORTON, JR. on the SUBJECT TELEPHONE NUMBER to arrange the purchase of illegal narcotics. Pursuant to those arrangements, later the same day, William MORTON, Jr. sold the CI approximately 28 grams of heroin in exchange for $725 in ACF. The suspected heroin was submitted to the DEA Lab, where it was determined to be 28.2 grams of a mixture containing both heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance.

18. The TARGET CELLULAR DEVICE is assigned the SUBJECT TELEPHONE NUMBER, the service for which is provided by AT&T ("SERVICE PROVIDER"). There is no listed subscriber information for the SUBJECT TELEPHONE NUMBER. During the course of

this investigation, William MORTON, Jr. has utilized the SUBJECT TELEPHONE NUMBER to communicate with the CI in order to conduct narcotics and firearms transactions and the CI has continued to communicate with William MORTON, Jr. via the SUBJECT TELEPHONE NUMBER, the most recent of which occurred on August 16, 2024.

19. Based on the foregoing, there is probable cause to believe that William MORTON, Jr. utilized and is continuing to utilize the TARGET CELLULAR DEVICE, which utilizes the SUBJECT TELEPHONE NUMBER, to facilitate illegal drug trafficking and illegal firearm transaction activities. Furthermore, there is probable cause to believe that the location of the TARGET CELLULAR DEVICE, which utilizes the SUBJECT TELEPHONE NUMBER, will reveal William MORTON, Jr.'s location and additional evidence of William MORTON, Jr.'s ongoing drug trafficking activities.

20. In my training and experience, I have learned that the SERVICE PROVIDER is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information (1) about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and

can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

21. Based on my training and experience, I know that the SERVICE PROVIDER can collect E-911 Phase II data about the location of the TARGET CELLULAR DEVICE, including by initiating a signal to determine the location of the TARGET CELLULAR DEVICE on the SERVICE PROVIDER'S network or with such other reference points as may be reasonably available.

22. Based on my training and experience, I know that the SERVICE PROVIDER can collect cell-site data about the TARGET CELLULAR DEVICE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the SERVICE PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. SERVICE PROVIDER has confirmed that it currently possesses the TARGET CELLULAR DEVICE and SUBJECT TELEPHONE NUMBER information, particularly the cell site information.

23. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms,

including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), Mobile Station International Subscriber Directory Number ("MSID"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen/trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Currently, the TARGET CELLULAR DEVICE can be identified by IMSI 310410388609428.

24. Based on my training and experience, I know that wireless providers such as the SERVICE PROVIDER typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the SERVICE PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET CELLULAR DEVICE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

25. Based on the foregoing, I request that the Court issue the proposed Search Warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

26. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET CELLULAR DEVICE or SUBJECT TELEPHONE NUMBER would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated by reference herein and into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

27. I further request that the Court direct the SERVICE PROVIDER to disclose to the government any information described in Attachment B, incorporated by reference herein and in the warrant, that is within the possession, custody, or control of the SERVICE PROVIDER. I also request that the Court direct the SERVICE PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with

services of the SERVICE PROVIDER, including by initiating a signal to determine the location of the TARGET CELLULAR DEVICE on the network of the SERVICE PROVIDER or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the SERVICE PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

28. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELLULAR DEVICE outside of daytime hours.

Further your affiant sayeth not.

_____
Richard L. Schauer, Jr., Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and ascribed before me, this 19th day of August, 2024, in Richmond, Virginia.

_____/s/_____
The Honorable Summer L. Speight
United States Magistrate Judge

11

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

1. The cellular telephone ("TARGET CELLULAR DEVICE") assigned call number (804) 759-1341 ("SUBJECT TELEPHONE NUMBER") with International Mobile Subscriber Identifier ("IMSI") 310410388609428, with no listed subscriber information, and which is known to be utilized by William MORTON, Jr. who is believed to live at 1901 Q Street Richmond, VA 23223; the service provider for which is AT&T ("SERVICE PROVIDER"), headquartered at 11760 US Hwy 1 North Palm Beach, FL 33408.

2. Information associated with the TARGET CELLULAR DEVICE and SUBJECT TELEPHONE NUMBER that is within the possession, custody, or control of the SERVICE PROVIDER, including information about the location of the TARGET CELLULAR DEVICE if it is subsequently assigned a different call number and any new cellular device assigned to utilize the SUBJECT TELEPHONE NUMBER.

# ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

I. **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of AT&T ("SERVICE PROVIDER"), including any information that has been deleted but is still available to the SERVICE PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the SERVICE PROVIDER is required to disclose to the government the following information pertaining to the TARGET CELLULAR DEVICE and SUBJECT TELEPHONE NUMBER, identified in Attachment A and its related account with the SERVICE PROVIDER ("SUBJECT ACCOUNT"):

A. The following information about the customers or subscribers associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
3. Local and long-distance telephone connection records;
4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
5. Length of service (including start date) and types of service utilized;
6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and
8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

   B. **The following historical stored telecommunications records associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:**

      1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:
         a. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and
         b. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET CELLULAR DEVICE.

   C. **The following prospective data associated with the TARGET CELLULAR DEVICE for the time period of 30 days from the date of the Warrant or the date the monitoring of the TARGET CELLULAR DEVICE location becomes operational, whichever is later:**

      1. Information associated with each communication to and from the TARGET CELLULAR DEVICE for a period of 30 days from the date of the Warrant or the date the monitoring equipment for the device's location becomes operational, whichever is later, during all times of day and night, including:
         a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;
         b. Source and destination telephone numbers;
         c. Date, time, and duration of communication; and
         d. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET CELLULAR DEVICE.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.     INFORMATION TO BE SEIZED BY THE GOVERNMENT

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 21 U.S.C. § 841 distribution of illegal controlled substances, and 18 U.S.C. § 922(g)(1), possession of a firearm by a convicted felon, have been committed by William MORTON, Jr. a.k.a. "Skillet" during the period March 25, 2024, to the present day.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the SERVICE PROVIDER in order to locate the things particularly described in this Warrant.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE: APPLICATION OF THE UNITED STATES OF AMERICA FOR SEARCH WARRANT AND ORDERS PURSUANT TO 18 U.S.C. §§ 2703(C)(1)(A) AND 3122(A)(1) FOR THE <br> (1) DISCLOSURE OF PROSPECTIVE CELL-SITE DATA AND E-911 PHASE II DATA; <br> (2) DISCLOSURE OF STORED TELECOMMUNICATIONS RECORDS; AND <br> (3) INSTALLATION OF A PEN REGISTER/TRAP AND TRACE DEVICE <br> ON (804) 759-1341 | No. 3:24-SW156 |

**NOTICE**

☒   The undersigned attorney certifies that the attached Application, Warrant, and proposed Orders precisely follow the language previously approved by the Magistrate Judges of the Eastern District of Virginia.

☐   The undersigned attorney certifies that the attached Application, Warrant, and proposed Orders precisely follow the language previously approved, except for the following specified paragraphs or items:

Respectfully submitted,

*/s/ Olivia L. Norman*
Olivia L. Norman
Assistant United States Attorney

VERSION: April 2021